Joe Traum and Mae Traum v. Commissioner.
Traum v. Commissioner
Docket No. 39895.
United States Tax Court
T.C. Memo 1955-127; 1955 Tax Ct. Memo LEXIS 214; 14 T.C.M. (CCH) 469; T.C.M. (RIA) 55127; May 19, 1955
*214 1. Held: As petitioners failed to sustain their burden of proof the deficiencies (with some adjustments) for the years 1947 through 1950 are sustained. 2. Held: Respondent failed to establish fraud by clear and convincing evidence. Accordingly petitioners are not liable for the additions to tax asserted for the years 1947 through 1950. 3. Held: Assessment and collection of the deficiency (as adjusted) for the year 1947 is not barred by the statute of limitations. 4. Held further: Petitioners are not entitled to any deduction in 1950 for business bad debt in the amount of $29,373.35. S. Major Cohee, Esq., 748 Bankers Trust Building, Indianapolis, Ind., for the petitioners. Charles R. Hembree, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent *215 determined deficiencies in income tax and additions to tax because of fraud for the taxable years ended December 31, as follows: 50% Addition
Year
Deficiency
to Tax
1947
$ 9,431.39
$4,715.70
1948
13,283.01
6,641.51
1949
15,156.51
7,578.26
1950
4,227.24
2,113.62
Respondent has made a jeopardy assessment of the deficiencies and additions to tax pursuant to section 273, Internal Revenue Code of 1939. In addition to the issues here presented petitioners assigned as error several of the other adjustments made in determining the asserted deficiencies; however, as no evidence was offered or argument made as to these issues they are accordingly deemed to have been abandoned. The adjustment made to petitioners' taxable income for 1947, relative to the sale to Earl Harmas, Jr., has been conceded by respondent. At the hearing petitioners asked and were given permission to file an amended petition asserting that they were entitled to an ordinary business loss of $29,373.35 in 1950. The issues in this proceeding are: 1. Whether respondent has correctly determined the taxable income of petitioners for each of the years 1947 to 1950, inclusive. *216 2. Whether any part of the deficiency determined for each of the years 1947 through 1950 is due to fraud with intent to evade tax. 3. Whether the deficiency determined for the taxable year 1947 is barred by the statute of limitations. 4. Whether petitioners are entitled to an ordinary business loss in the amount of $29,373.35 for the year 1950. Findings of Fact Petitioners are husband and wife who resided in Terre Haute, Indiana from 1947 through 1950. They filed their joint income tax returns for the years here involved with the collector of internal revenue for the district of Indiana. During 1947 petitioners were the operators of a restaurant variously known as Traum's Show Lounge, Restaurant Lounge, and Show Lounge (hereinafter referred to as the Show Lounge). Thereafter and in the same year the Show Lounge was closed and petitioners took over the active management of the Manor House, a private club which belonged to the Syrian Patriotic Club, Inc., a corporation organized under the laws of Indiana. Petitioners had first become associated with the Manor House in March of 1947, when their son Joe Traum, Jr. became its manager and needed assistance in making the business *217 a paying concern. The operations of the Manor House consisted of a restaurant and a club room, which was a gambling casino. Separate books were kept for each of these activities. All income received at the Manor House was considered and so entered on the books of the Syrian Patriotic Club, Inc. as corporate income. Mae Traum owned all the real property upon which the Manor House operated. From 1947 through 1950 the same bookkeeper was employed by petitioners to keep their personal books (under the name of Traum's Show Lounge) and the books of the Manor House. In a number of cases (especially as to sales from the Show Lounge to the Manor House) on both sets of books it was the practice of the bookkeeper to show the net amount of a transaction rather than entering the income and expense items separately. On occasion the advice of Edward Strachen, a certified public accountant, was sought as to correct accounting procedure. Because the Manor House restaurant was in considerable financial stress from 1947 through 1950 petitioners from time to time advanced to it large sums of money and from time to time small amounts of these loans were repaid. During this period petitioners borrowed *218 $1,000 from Jennie Van de Voorde, which amount was paid back through petitioners' Manor House account. In 1947 petitioners sold to the C.I.O. Club furniture and fixtures for $40,000 consisting of a $5,000 deposit and a $35,000 installment contract. During the taxable years here reviewed the C.I.O. Club partially defaulted in its payments but at the end of 1950 petitioners considered that there was a good chance of collecting the balance due. In 1947 petitioners sold to Earl Harmas, Jr. stock, equipment, and a beverage license for $6,500. Except for 1947 when they also operated the Show Lounge petitioners' business in the years 1947 through 1950 consisted of operating the Manor House restaurant and club room, operating slot machines located in various clubs in Terre Haute, distributing lottery tickets, owning an interest in a crap game, and receiving income from the C.I.O. installment contract. In their income tax returns for 1948 and 1949 petitioners deducted $1,136.75 and $749 (the cost of slot machines purchased in 1948 and 1949), respectively, as "replacement of machines." Petitioners bought slot machines for $225 to $250 and held them for about a year before trading them *219 in for approximately $100. During the years 1947 through 1950 petitioners owned the land and building at 671 Wabash Avenue, Terre Haute, Indiana. In their tax returns for each of those years petitioners took deductions for depreciation of this building. Throughout the period here reviewed petioners received certain sums from their son, Joe Traum, Jr., in full payment for advances made to him during that time. Edward Strachen prepared petitioners' income tax returns for the years 1947 to 1950, inclusive. Strachen was furnished summary records by petitioners' bookkeeper, plus information, also in summary form, from Joe Traum as to what additional income he had. Petitioners reported taxable net income for each of the years here reviewed as follows: Year
Net Income
1947
$ 4,461.67
1948
13,441.35
1949
10,311.71
1950
3,093.74
Respondent determined petitioners' net income for each of the taxable years in question as follows: Year
Net Income
1947
$27,147.06
1948
47,136.10
1949
49,336.68
1950
20,513.94
In computing the asserted deficiencies respondent made inter alia the following adjustments to petitioners' income for the years *220 1947 through 1950: 1. Petitioners were charged with additional income as follows: A. $3,500 profit in 1947 on the sale to Earl Harmas, Jr. B. "Dividends." 1947
$ 100.42 [1]
1948
2,857.31 [1]
1949
1,849.67 [1]
1950
.95 [2]
C. $7,432.60 profit on "Sales to Manor House" in 1947. The revenue agent's report, which was incorporated into the deficiency notice, stated: "The taxpayers [taxpayer] records could not be analyzed with certainty as to Manor House Sales. Taxpayer may have reduced expenses by amount of same." D. "Business or Profession." 1947
Other Income
Traum's additional in-
vestment
$18,894.71
1948
Miscellaneous
$27,842.64
1949
Miscellaneous
$31,815.89
Miscellaneous income is
determined as follows: Funds entering business
- not receipts
$26,588.78
Cash given to Steve
Semelich and later re-
turned to Joe
1,000.00
Maintenance paid by
cash
663.34
Travel and entertainment
paid by cash
2,792.27
Auto expense paid by
cash
720.00
Auto gas tax and li-
censes
51.50
$31,815.89
1950
Miscellaneous
$16,389.04
Explanation
Cash deposited in check-
ing account
$ 200.00
Cash loaned to V.C.
I.U. Council
300.00
Cash deposited in check-
ing account
1,100.00
Cash given to Charles
Gordon Club 86 in-
vestment
4,104.57
Deposited in checking
account (cash)
$ 500.00
Deposited in checking
account
500.00
Cash loaned to V.C.
I.U. Council
20.00
Check received in ex-
cess of checks depos-
ited and entered as
income
194.25
Deposited in checking
account
254.23
Deposited in checking
account
42.30
Deposited in checking
account
500.00
Paid to Silverstine Fur-
niture Store
314.25
Deposited in checking
account
100.00
Deposited in Mae
Traum's Sav. Acct.
433.00
Deposited in Mae
Traum's Sav. Acct.
600.00
Deposited in checking
account
500.00
Cash loaned to V.C.
I.U. Council
345.00
Cash loaned to V.C.
I.U. Council
125.00
Cash used to pay misc.
taxes
1,000.00
Cash loaned to V.C.
I.U. Council
35.00
Cash deposited to Mae
Traum's Sav. Acct.
60.00
Cash loaned to V.C.
I.U. Council
275.00
Cash deposited to Mae
Traum's Sav. Acct.
207.00
Cash loaned to V.C.
I.U. Council
60.00
Check deposited to check-
ing account
237.63
Check deposited to check-
ing account
2.61
Various loans to Z-11
Club Inc.
663.70
Various cash spent for
travel and entertain-
ment
2,940.50
Various cash spent for
auto
720.00
Various Indiana gas and
auto tax
55.00
Adjustment
$16,389.04
*221 2. Deductions taken in 1948 and 1949 for replacement of slot machines in the amounts of $1,136.75 and $749, respectively, were disallowed, and the amounts thereof were treated as capital expenditures. Deductions for depreciation (based on a 10-year life) on these machines and those purchased in 1950 are allowable as follows: Slot Machines
Purchased in
Cost
1948
$1,136.75
1949
749.00
1950
799.00
Depreciation Allowable
1948
1949
1950
$113.68
$113.68
$113.68
37.45
74.90
(6 mos.)
39.95
(6 mos.)
3. Depreciation allowable on the building at 671 Wabash Avenue, based on a 30-year life, is $512.28 per year. The income tax return for 1947 was filed on or before March 15, 1948. On or before January 30, 1951, petitioners and respondent entered into and executed a written agreement whereby the time for assessing the tax due from petitioners for the taxable year ended December 31, 1947, was extended to any time on or before June 30, 1952. The statutory notice of deficiencies for the years here involved was mailed January 11, 1952. Opinion On brief respondent states that he has determined the asserted deficiencies by a reconstruction *222 of petitioners' income for each of the years 1947 through 1950 based on the so-called "bank deposits and expenditures" method. Except for objections to certain of the item adjustments, the contentions of petitioners are not set out with any degree of clarity either on brief or at the hearing. Apparently, they not only contest the propriety of resorting to this method of determining income under the circumstances here present but also proceed upon the erroneous theory that it is respondent's burden to prove the deficiencies as well as the fraud. It is well settled that the determinations by the respondent are presumed correct and so being the burden is on the taxpayer to establish the contrary. Joseph V. Moriarity, 18 T.C. 327, affd. 208 Fed. (2d) 43; Murtha & Schmohl Co., 17 B.T.A. 442. Except as to two of the adjustments relating to the year 1947 (one of which is conceded by respondent), we do not think petitioners have sustained this burden. Petitioners were charged with additional income for 1947 in the amount of $7,432.60 from "Sales to Manor House." The revenue agent making this adjustment noted in his report that "The taxpayers [taxpayer] *223 records could not be analyzed with certainty as to Manor House Sales. Taxpayer may have reduced expenses by amount of same." Petitioners proved that it was the practice of their bookkeeper to show the net amount of some transactions, especially sales to the Manor House, rather than separately entering the income and expense items. Accordingly we hold this adjustment by respondent to be in error. Respondent has conceded error in charging petitioners with $3,500 profit on the sale of equipment to Earl Harmas, Jr., in 1947. Petitioners claim that depreciation deductions of 100 per cent should be allowed on slot machines purchased in 1948, 1949, and 1950. Apparently, they base this contention on testimony by Joe Traum that the machines would be traded in about every year. We find no merit in this argument for there is no proof that the machines were valueless at the end of the years involved. On the contrary the record shows that petitioners would receive "in the neighborhood of $100" per machine on the trade-in. Therefore, as petitioners failed to submit any evidence relating to the proper depreciation of these slot machines the determinations by respondent are sustained. Respondent *224 has allowed deductions for depreciation of the Wabash Avenue building, based on a 30-year life, in the amount of $512.28 per year. Petitioners contend that the proper deductions for depreciation are as follows: 1947
$833.38
1948
856.47
1949
856.47
1950
856.47
For support petitioners rely on the testimony of Paul Pfister, a real estate man with some experience in appraising. In substance Pfister testified that the value of the property as of July 1, 1946 was $50,000, that its useful life was thirty to thirty-three years, and that one-half of the value of the property should be attributable to the land and one-half attributable to the building. He testified that this opinion was based on "the past records that we have accumulated in the firm * * *." There was no other evidence substantiating the appraisal. There is no precise rule of law as to the amount of information a witness must have concerning property before he may be permitted to give an opinion of its value. All that is required is that he be sufficiently familiar with the property so that his opinion is based on something more than conjecture. Without regard as to whether or not Pfister had the requisite *225 knowledge we accord no weight to his opinion as it was based on facts not shown in the record. Petitioners argue that the records referred to in Pfister's testimony concern the cost of the building; however, we have found no evidence to support this claim. Although estimates of experts are entitled to careful consideration, they are not binding on this Court (Cf. H. H. Blumenthal, 21 B.T.A. 901) and do not constitute proof of the facts upon which they are based. Petitioners contend that they owned no stock during the taxable years under review and therefore respondent erroneously charged them with "dividends" in those years. As the deficiency notice indicates, the amounts denominated as "dividends" consisted of interest and payments made for the benefit of petitioners by the Manor House. Perhaps respondent's choice of label for these payments was ill-advised, but mere nomenclature will not serve as the key for avoidance by petitioners of the tax on this income. No other objection having been raised to this adjustment, it is sustained. In each of the years 1947, 1948, 1949, and 1950 respondent adjusted petitioners' income by adding thereto certain amounts denominated *226 as "Traum's Additional Investment", "Miscellaneous", and "Miscellaneous Income", respectively. On brief respondent explains that these amounts result from the necessity of reconstructing petitioners' income and represent amounts disbursed by petitioners, but unexplained as to sources of receipt. Petitioners do not claim that these amounts were expended from a large amount of cash on hand; but rather, that they were made out of nontaxable receipts, such as loans. In an effort to rebut these adjustments petitioners submitted in evidence an alleged "net worth statement" (hereinafter sometimes referred to as Exhibit 8) which was intended not only to supply the sources of receipt but also to prove the receipts nontaxable. However, we have found the condition of this exhibit so unsatisfactory that it has been accorded no weight in making our determinations. If the figures stated therein are taken as correct the exhibit contains mathematical inaccuracies, if not it is replete with untruths and/or typographical errors; accounts with the same name are indistinguishable; accounts relating to the Manor House were not cross-checked with the Manor House books; and the certified public accountant *227 who prepared the exhibit admitted that this "net worth statement" was based on books and records and statements by Joe Traum about which he had no way of knowing the truthfulness of what was shown or stated. In an attempt to bolster Exhibit 8 petitioners' certified public accountant testified that he made an examination of "some sheets" which he believed to be part of the "work papers" of respondent's agent. He stated that there were several differences between the computation set out in the net worth statement and those shown on the alleged work papers, especially in the treatment accorded "Sales to the Manor House", the amounts loaned to Joe Traum, Jr., the loan by Jennie Van de Voorde, and an alleged loan by Barbara Semelich. Nowhere were the "work papers" identified and introduced into evidence as such. Therefore, we are unable to attach any significance to the analysis by petitioners' witness, especially as it was admittedly based on many assumptions. The statutory notice of deficiency speaks for itself as to what adjustments respondent made. Petitioners introduced other evidence attempting to prove the existence of loans by Barbara Semelich and Jennie Van de Voorde, bank *228 loans and sums loaned to and repaid by Joe Traum, Jr. However, we found this evidence insufficient to require further adjustment to respondent's determination. For example, although we found that petitioners were loaned $1,000 by Jennie Van de Voorde and that Joe Traum, Jr. was loaned certain sums which he repaid in full, the record is completely devoid of any reliable evidence as to the dates of these transactions and the amounts loaned and repaid by petitioners' son. The only evidence other than Exhibit 8 with regard to bank loans was the self-serving testimony of Joe Traum which was lacking in dates, amounts, and sources. Lastly, petitioners tried to prove the existence of the Semelich loan by testimony of their bookkeeper that she cashed the check and gave the money to Joe Traum. However, the bookkeeper further testified that the check was for an unknown amount and payable to an unknown payee. In addition the date of this alleged loan was uncertain. All of the other adjustments made by respondent in determining the deficiencies remain unchallenged or the objections thereto abandoned. Accordingly, the deficiencies determined by respondent, as modified, are sustained. In addition *229 to the deficiencies asserted respondent has assessed a 50 per cent addition to tax because of fraud for each of the taxable years pursuant to section 293(b), Internal Revenue Code of 1939. [1]
A charge of fraud is never to be taken lightly. It is never imputed or presumed, and the ordinary preponderance of evidence is not sufficient to establish the charge. If, as in the instant proceeding, fraud is not admitted, the burden then falls upon respondent to prove it by clear and convincing evidence. Henry S. Kerbaugh, 29 B.T.A. 1014, aff'd 74 Fed. (2d) 749. Respondent contends that he has sustained his burden in the instant proceeding. Specifically respondent points out that the adjustments set out in the deficiency notice represent gross understatements in income and as petitioners have failed *230 in their burden of proof his adjustments must be considered correct. Therefore, respondent concludes, the consistent understatement of income in each of the years here involved is in and of itself convincing evidence of an attempt to defraud the Government, citing Charles A. Rogers, 38 B.T.A. 16, affd. 111 Fed. (2d) 987; and Arlette Coat Co., 14 T.C. 751. We cannot agree. To do so would be tantamount to holding that fraud may be presumed. Fraud must be separately and affirmatively established by respondent, Arthur M. Godwin, 34 B.T.A. 485; and, except for the tax returns for the years here reviewed, respondent introduced no evidence with respect to this issue. We have been shown only that there were large understatements of income, and on that showing respondent rests his case. That is not sufficient to carry his burden to establish fraud. The Commissioner cannot sustain his burden of proof as to fraud by statements made in his notice of deficiency. Oscar G. Joseph, 32 B.T.A. 1192, 1204. Cf. C. A. Reis, 1 T.C. 9, 13. Fraud is not established by the mere understatement of taxable income. If it were *231 then all taxpayers against whom deficiencies are determined would be guilty of fraud and subject to the imposition of an addition to tax under section 293(b). James Nicholson, 32 B.T.A. 977, affd. (C.A. 8), 90 Fed. (2d) 978. The cases cited by respondent are distinguishable. The holding in each is based on the entire record and not on the omission of income alone. In Charles A. Rogers, supra, in addition to the omissions, we found that the circumstances were such that the taxpayer knew the omitted amounts constituted taxable income. In Arlette Coat Co., supra, the Commissioner introduced separate and independent evidence to establish gross understatements in reported taxable income. We must next consider whether the deficiency determined for 1947 (as adjusted) is barred by the statute of limitations. The income tax return for that year was filed on or before March 15, 1948. On January 30, 1951, petitioners executed a written agreement whereby the time for assessing the tax due for the taxable year ended December 31, 1947 was extended to any time on or before June 30, 1952. The statutory notice of deficiencies was mailed January 11, 1952. Accordingly, *232 the deficiency for 1947 is not barred by the statute of limitations. Petitioners filed an amended petition asserting that they were entitled to a deduction in 1950 for an ordinary business loss arising out of the sale to the C.I.O. Club. An obligation incurred in a taxpayer's trade or business is deductible in the year it becomes worthless. Section 23(k)(1), Internal Revenue Code of 1939. [2] It is well settled that the burden of proof is on the taxpayer to show not only that the debt is worthless but also that it became worthless during the taxable year. W. B. Mayes, Jr., 21 T.C. 286; Nathan H. Gordon Corporation, 2 T.C. 571. According to Joe Traum's own testimony he considered at the end of 1950 the possibility of collecting the balance due on the installment contract to be good. Therefore, the obligation being of value in 1950 petitioners are not entitled to any deduction for a business bad debt. *233 Decision will be entered under Rule 50. Footnotes
1. "Personal expenses paid for Mae Traum in 1947 [8], [9] by the Manor House per Manor House records." (Deficiency notice.) SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
[2]↩ "Interest on Mae Traum's Savings account was omitted from income." (Deficiency notice.)
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩